# UNITED STATES DISTRICT COURT
for the
District of Minnesota

UNITED STATES OF AMERICA

v.

CHERNO NJIE (01) and
PAPA FAAL (02)

Case No. 15-mj-001(TNL)

## CRIMINAL COMPLAINT

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. From beginning on or before August 2014 and continuing until the present, in the State and District of Minnesota and elsewhere, the defendants

Participated in a conspiracy to make an expedition from the United States against a friendly nation

in violation of Title 18, United States Code, Sections 371 and 924(o).

I further state that I am a(n) Special Agent and that this complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof: ☒Yes ☐ No

_____
Complainant's signature

Nicholas Marshall, Special Agent
Printed name and title

Sworn to before me and signed in my presence.

Date: January 3, 2015

_____
Judge's signature

City and state: Bloomington, MN

The Honorable Tony N. Leung,
U.S. Magistrate Judge
Printed name and title

SCANNED
JAN - 5 2014
U.S. DISTRICT COURT MPLS

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
District Court File No. 14-MJ-_____

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>CHERNO NJIE (01) )<br>PAPA FAAL (02) )<br>)<br>Defendant. ) | **AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANT** |

I, Nicholas L. Marshall, being first duly sworn, hereby depose and state as follows:

STATE OF MINNESOTA )
) SS:
COUNTY OF RAMSEY )

## I. INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been employed by the FBI since August 2008. I am currently assigned to the FBI's Minneapolis Division. That has been my assignment since November 2014. As part of my duties as a Special Agent, I investigate, among other things, criminal violations relating to terrorism and other national security offenses. The statements contained in this affidavit are based on information I have learned through my own investigation; my background, training, and experience as a Special Agent assigned to the Joint Terrorism Task Force; the investigation of other FBI special agents and law enforcement officers;

records and other evidence obtained during the course of this investigation; and discussions with individuals as set forth in this affidavit. This affidavit is intended to show merely that there is probable cause to believe that the defendants, CHERNO NJIE and PAPA FAAL, have committed a federal crime. It does not set forth all of my knowledge about this matter.

2. NJIE is a 57-year-old United States citizen of Gambian descent and resident of the State of Texas.

3. FAAL is a 46-year-old dual United States and Gambian citizen and resident of the State and District of Minnesota. FAAL also reportedly served in both the United States Air Force and the United States Army.[1]

## II. PURPOSE OF THE AFFIDAVIT

4. I make this affidavit in support of an application for a criminal complaint charging the defendants NJIE and FAAL with:

    a. Count One: Conspiracy to violate the Neutrality Act (18 U.S.C. § 960) by conspiring to make an expedition against a friendly nation from the United States, in violation of Title 18, U.S.C. § 371. The Neutrality Act states as follows:

> Whoever, within the United States, knowingly begins or sets on foot or provides or prepares a means for or furnishes the money for, or takes part in, any military or naval expedition or enterprise to be carried on from thence against the territory or dominion of any foreign prince or state, or of any

---

[1] FAAL stated to interviewing agents that he served in the Air Force for seven years and the Army for three years. He stated that he was discharged from the Army on March 10, 2012.

2

colony, district, or people with whom the United States is at peace, shall be fined under this title or imprisoned not more than three years, or both.

and

b. Count Two: Conspiracy to Possess a Firearm in Furtherance of a Crime of Violence, specifically, Title 18, U.S.C. § 960 (the Neutrality Act), all in violation of Title 18, U.S.C. § 924(o).

## III. FACTS CONSTITUTING PROBABLE CAUSE

### THE GOVERNMENT'S INVESTIGATION

*Summary*

5. On or about December 30, 2014, there was an attempted coup against the government of The Gambia.[2] As described more fully below, the FBI has interviewed FAAL who described his participation as a member of a group of fighters responsible for the attempted coup. FAAL also identified NJIE as one of the leaders and main financiers of the coup. According to FAAL, NJIE was also planning to serve as the interim leader of The Gambia upon the successful completion of the coup.

---

[2] Your affiant is aware that after the attempted coup in The Gambia, U.S. State Department officials publicly stated that "[t]there has been no sign of transfer of political or military power." The U.S. State Department also denounced the coup attempt, stating: "We strongly condemn any attempt to seize power through extra-constitutional means. We regret the loss of life and call on all parties to refrain from further violence."

3

*FAAL's Interviews to the FBI Reveal Details About the Attempted Coup in The Gambia*

6. On or about December 31, 2014, the defendant PAPA FAAL, entered the United States Embassy in Dakar, Senegal,[3] where he was interviewed by the FBI Legal Attaché and the Assistant Regional Security Officer. Following this interview, FAAL boarded a flight to the United States and arrived in the Washington, D.C. area the next day, January 1, 2015. Upon his arrival, FAAL was interviewed by FBI agents at Dulles International Airport. Based on my review of reports made of these interviews, I am aware that FAAL was advised of his Miranda rights before each interview and that FAAL provided the following information in pertinent part:

---

[3] The West African country of Senegal borders the country of The Gambia on three sides.



4

*The Conspiracy and Its Members*

a. In August 2014, FAAL was invited by other conspirators then in the United States to join a movement to purportedly change the leadership of The Gambia. FAAL agreed to join this movement because he had become disenchanted by the way "the president was rigging elections" and because of his concerns for the "plight of the Gambian people." Even though it had been 23 years since he resided in The Gambia, FAAL still had family in The Gambia and felt a connection to his people.

b. FAAL and the other men rarely met in person but did talk on the phone. The members of the group were known to each other by code names; the only true name he knew for sure was Subject #1's name. FAAL's code name was "Fox."

c. FAAL stated that all the co-conspirators known to him were of Gambian descent. Some lived in The Gambia and Senegal, but most lived in the diaspora in the United States and Germany. Although FAAL believed a larger group would travel to The Gambia to participate in the coup, only 10-12 ultimately entered The Gambia to carry it out, including some members from the United Kingdom.

d. FAAL identified the leader of the group by his code name, "Dave" (an individual known to your affiant to be defendant NJIE). Dave was a businessman who financed the operation and was to be installed as the leader of

5

The Gambia after the successful coup. FAAL met Dave for the first time in The Gambia, prior to the coup. FAAL understood Dave's role during the operation was to stay in a safe place until the State House[4] was seized. Dave was then to meet the commander of the Gambian Army and convince him to have the Army stand down and support the change in leadership.

e. FAAL identified Subject #1 as the military leader of the operation. Subject #1 was also in the United States prior to traveling overseas to participate in the coup. Subject #1 controlled the money for the operation as well as its planning and execution. Subject #1 provided FAAL money to deposit in his (FAAL's) bank account. FAAL understood that each of the men participating in the operation was given $4000 to deposit in his bank account in order to pay bills while they were in The Gambia.

*FAAL's Knowledge of Pre-Departure Planning in the United States*

f. FAAL was invited to join the group by Subject #2, who was also in the United States. Subject #2 called FAAL in August, 2014. FAAL understood that he was the last of the Americans to join the conspiracy and an Operations Plan had already been created by the time he joined.

g. The group's plan for the coup was purportedly to restore democracy to The Gambia and to improve the lives of its people. They hoped they would be able to take over the country without having to kill any Gambians. They also

---

[4] Your affiant understands the State House to be the Office of the Gambian President.

6

expected to be joined by up to 160 members of the local Gambian military who supposedly agreed to participate in the coup. The group's Operations Plan was stored online where only the members of the conspiracy could view it. FAAL could only access the Operations Plan utilizing a link sent to FAAL's email account.

 h. The group also conducted conference calls every other week in which they discussed their plans. FAAL did not believe anyone outside of the group, including the United States government, knew of their plans, nor did FAAL believe that any of the conspirators let their wives or families know about the coup attempt ahead of time.

 i. The group did not meet in person until they were all in The Gambia and preparing for the operation. Most, if not all, of the members of the group had served in the U.S. or Gambian military and were avid shooters. FAAL enjoyed going to the firing range in the U.S. for practice, but did not go shooting specifically for operational purposes.

*FAAL Acquires Weapons and Other Logistics for the Attempted Coup in The Gambia*

 j. Between August and October 2014, FAAL and two other U.S.-based members of the conspiracy (Subject #1 and Subject #2) each purchased eight M4 and AKM firearms at gun shops throughout the United States. FAAL himself purchased "lawfully" eight M4 semi-automatic rifles in Minnesota and hid them in

7

four "50 gallon barrels" – two rifles per barrel. FAAL stuffed clothing in the barrels around the disassembled weapons to conceal them.

    k.    FAAL purchased the weapons using $6000 provided to him by Subject #1 to buy the guns.

    l.    The barrels were "containerized" and shipped under an alias fabricated by FAAL. FAAL estimated that approximately 30 weapons were shipped to The Gambia by cargo ship.

    m.    FAAL admitted he knew shipping the guns was illegal, but was more concerned with carrying out the coup.

    n.    Subject #2 acquired most of the remainder of the equipment. He ordered body armor and ammunition and had it shipped it to The Gambia. The group was also equipped with two pairs of night vision goggles, black military style uniform pants, boots, and other personal equipment.

*FAAL Departs the United States To Engage in Violence Against the Government of The Gambia*

    o.    FAAL left the U.S. on December 3, 2014, via South African Air, and arrived in Senegal. FAAL then immediately traveled to The Gambia overland, where he stayed until the coup attempt. Once the rest of the group arrived in The Gambia, the group spoke by phone and rarely met with each other.

*Preparatory Actions in Gambia*

    p.    Once the conspirators were all in The Gambia, they began to implement their Operations Plan. The group conducted reconnaissance and

8

"mental dry runs" of their plan while in The Gambia. The group initially planned to ambush the President of The Gambia during his overland travels around Christmas and New Year's. The group hoped to be in control of the country by New Year's Day. Their plan entailed blocking the President's convoy and ambushing his vehicle. They planned to fire shots into the air to cause his bodyguards to flee. They hoped the President would surrender, but were willing to shoot him if he fired at them.

q. The group's plans changed when they found out President Jammeh was going to leave the country on December 26, 2014. They hoped to still ambush him but ultimately abandoned their plans to do so. Instead, the group decided to change their operation again and attack the State House.

*The Members of the Conspiracy Attack the State House*

r. The conspirators were split in two teams, "Alpha" and "Bravo" Teams. Both Teams met in the woods about a half-mile from the State House. There, they changed into their assault gear and put their other belongings into the rented cars they were going to use in the assault.

s. Alpha team was led by Subject #1 and included Subject #2, among others. Alpha Team was responsible for attempting to breach the front door of the State House using one of the group's rented vehicles. They were then supposed to disarm the guards and take control of the building. Bravo Team, including FAAL, was tasked with securing the rear of the building. The group

9

believed the Gambian Army soldiers at the State House would drop their weapons and flee, being unwilling to die for President Jammeh. The group expected that while the two teams took control of the State House, a battalion of Gambian soldiers sympathetic to the conspirators would arrive and offer support.

t.  When the group arrived at the State House, they found that it had been fortified with additional soldiers. According to their plan, Alpha Team fired a shot into the air, hoping the soldiers would give up. Instead, the group began taking heavy fire from the guard towers. Alpha Team attempted to breach the door of the State House. FAAL believes all of the Alpha Team members were killed.

u.  Bravo Team lost radio communications with Alpha Team and decided to retreat. "Sarr," a member of Bravo Team attempted to drive a car into the State House door and was killed in sight of FAAL. FAAL fled the scene and took refuge in a nearby building, removed his body armor, boots, and military-style clothing, and changed into clothes obtained from a man in the building.

*FAAL Escapes to Senegal*

v.  At dawn, FAAL left the building and attempted to blend into the crowds on the street. Because the ferry was shut down, FAAL spent the night in The Gambia. The next day, FAAL traveled back to Senegal by ferry. However, he was refused entry into Senegal because he did not have an exit stamp from Gambian authorities. He was then forced to return to The Gambia on the ferry

10

and obtain an exit stamp – which FAAL did accomplish. FAAL then boarded the ferry again and accomplished his escape to Senegal.

  w. Once in Senegal, FAAL traveled to the U.S. Embassy in Dakar.

*FAAL Identifies Photograph of "Dave" (NJIE)*

7. During the course of the interview on January 1, 2015, agents presented a photograph of a NJIE to FAAL. FAAL identified the individual in the photograph as the person he knew as "Dave."

*FBI Agents Discover Coup-Related Materials at FAAL's Residence in Minnesota*

8. I am aware that on January 1, 2015, FAAL provided the interviewing agents with written consent to search his residence in Brooklyn Center, Minnesota.

9. On January 1, 2015, FBI agents searched FAAL's residence. During the course of the search, several items of investigative interest were found, including the following:

  a. Receipts for the purchase of three used 55-gallon drums on September 9, 2014.

  b. Three manuals for the Colt AR-15 semi-automatic rifle, which your affiant knows can be referred to as an "M4" semi-automatic rifle.

  c. Google satellite images of The Gambia, including images of the area in the capital city, Banjul, where open-source reporting indicates the attempted coup took place. (*See* Attachment 1). These images were found in a manila file

11

folder. On the cover of the file folder the words "top secret" were handwritten and underlined in black ink.[5]

10. On January 1, 2015, I reviewed a copy of FAAL's passport and observed that it contains stamps showing that FAAL entered The Gambia on December 4, 2014, and departed The Gambia on December 31, 2014.

11. On January 1, 2015, I reviewed email correspondence from a U.S. Customs and Border Protection official that stated NJIE departed the United States on December 19, 2014, aboard South Africa Airlines flight 208 from Dulles to Dakar, Senegal. As described below, NJIE returned to the United States from Senegal on January 3, 2015.

*A Search of NJIE's Residence and Business Offices Demonstrates NJIE's Prominent Role in the Conspiracy*

12. On or about January 3, 2015, FBI agents searched premises located in Lakeway and Austin, Texas belonging to NJIE pursuant to search warrant issued by a federal magistrate judge in the Western District of Texas. I have reviewed material produced from the search conducted at these premises. Among the items seized were the following:

    a. A handwritten document that appears to describe the author's vision for The Gambia following a transition in political power.

    b. Handwritten notes containing the following questions:

        i. Do you have a budget?

---

[5] Your affiant has no reason to believe these images are classified U.S. Government information.

12

  ii.  How many troops do you have?

  iii.  What is your plan after a takeover?

  iv.  What is the transition period for a return to civilian rule?

 c. A spreadsheet appearing to depict the prices of various weapons and other items of logistical support:

| Item | Unit Price | Notes | Total |
|---|---|---|---|
| Weapons and Accessories: M4s/AKs or mix, Machine-guns, Pistols, ACOGs/ CCOs/ other scopes, plus Ammo | 28 rifles, 4 machine-guns, 8 pistols, 15 Sights | ***SEE refined "Essential Items, Equipment, and Ammo List" for details/breakdown*** ...some items have already been bought...total will reflect only items still needed. | Weapons: $34,980.00 Ammo: $4,559.00 |
| Initiators (5) | $1,000 | ECMs | $5,000 |
| Transportation | $2,000 | Transportation of 20 personnel to AO | $40,000 |
| Sustainment | $2000/month | Sustainment of 18 personnel for 2 weeks, and 3 personnel for 4 weeks on the ground | $24,000 |
| Rear Sustainment | $1000/month | Sustainment of ...family members stateside | $10,000 |
| Communication | | | Included in Essential Items List |
| Vehicle Rentals | $5,000 | Rental vehicles for movement around AO | $5,000 |
| ESSENTIAL Items | $35,000 | ***SEE refined "Essential Items, Equipment, and Ammo List" for details/ breakdown***...total will reflect only items still needed | $48,659 |
| Storage for Equipment | $100 X 3 | For one (1) month plus $100 deposit each | $600 |
| | | | $8,000 |
| 2 Barrett 50.cal SNIPER RIFLES | $4,000.00 | NOT really necessary but could be very useful | |
| Incidentals/Miscellaneous/Emergency | | | $10,000 |
| TOTAL | | | $220,798.00 |

 d. A document entitled "Gambia Reborn: A Charter for Transition from Dictatorship to Democracy and Development."

 e. From paperwork found on NJIE's desk, a notepad containing information relating to The Gambia, including the name "Papa Faal" and the

13

numbers X/XX/1968, U.S.A. XXXXX6387.[6] Your affiant knows these numbers to represent both the date of birth of FAAL and FAAL's U.S. passport number.

*Evidence Suggests NJIE Contacted the Spouse of one of the Participants of the Coup Reportedly Killed in The Gambia*

13. On December 31, 2014, FBI agents interviewed one of NJIE's neighbors who provided the FBI with a business card belonging to NJIE. This business card depicted NJIE as the President of Songhai Development, LLC, located in Austin, Texas. The card also listed NJIE's phone number (XXX-XXX-6514) and email account.[7] According to Texas State business filings, NJIE was the manager of a business located at the aforementioned address under the business name Chelsea Seniors I, LLC.

14. During a subsequent interview of the spouse of one of the suspected deceased coup participants, the spouse indicated that on or about December 31, 2014, she was notified by an unknown male caller that her husband was killed. According to the spouse, the caller utilized telephone number XXX-XXX-6514, the same number depicted on NJIE's business card.

*NJIE Returns to the United States and is Arrested*

15. On January 3, 2015, NJIE arrived at Dulles International Airport from Dakar, Senegal. NJIE declined to be interviewed. FBI agents placed NJIE into

---

[6] FAAL's full date of birth and passport number were found during the search of NJIE premises; however, I have not depicted his full date of birth and passport number in this affidavit in order to protect FAAL's personal identifying information.

[7] I have redacted the full phone number in this affidavit to protect NJIE's personal identifying information.

14

custody based on their determination that sufficient probable cause exists to believe NJIE committed the federal offenses alleged herein.

16. Finally, based my investigation, it is my understanding that the United States is at peace with The Gambia.

## CONCLUSION

17. Based on the foregoing, I respectfully submit to this Court that there is evidence amounting at least to probable cause to believe that NJIE and FAAL have committed these federal crimes specified above in this affidavit, and that the nature of these crimes further supports the issuance of warrants by this Court for the arrest of NJIE and FAAL.

Respectfully submitted,

Nicholas L. Marshall
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before
me on this 3rd day of January, 2015.

The Honorable Tony N. Leung
United States Magistrate Judge

15